IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| LAPAULA TAYLOR, | § | |
|     PLAINTIFF, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. 4:12-CV-222-Y |
| | § | |
| CAROLYN W. COLVIN, | § | |
| ACTING COMMISIONER OF SOCIAL | § | |
| SECURITY, | § | |
|     DEFENDANT. | § | |

FINDINGS, CONCLUSIONS AND RECOMMENDATION
OF THE UNITED STATES MAGISTRATE JUDGE
AND
NOTICE AND ORDER

This case was referred to the United States Magistrate Judge pursuant to the provisions of

Title 28, United States Code, Section 636(b).  The Findings, Conclusions and Recommendation

of the United States Magistrate Judge are as follows:

FINDINGS AND CONCLUSIONS

I.      STATEMENT OF THE CASE

Plaintiff LaPaula Taylor ("Taylor"), appearing *pro se*, filed this action pursuant to

Sections 405(g) and 1383(c)(3) of Title 42 of the United States Code for judicial review of a

final decision of the Commissioner of Social Security denying her claim for a period of

disability, disability insurance benefits ("DIB") under Title II, and supplemental security income

("SSI") benefits under Title XVI of the Social Security Act ("SSA").  In May 2006, Taylor

protectively applied for social security benefits, alleging that her disability began on May 16,

2004.  (Transcript ("Tr.") 104, 237-47.)  Her applications were denied initially and on

reconsideration, and Taylor requested a hearing before an administrative law judge ("ALJ").  (Tr.

104, 122-29, 131-38.) On July 9, 2008 the ALJ held a hearing and issued a decision on September 26, 2008 that Taylor was not disabled. (Tr. 29-58, 84-95, 104.) Thereafter, in October 2008, Taylor filed new applications for DIB and SSI. (Tr. 97, 104.) Subsequently, the state agency found that Taylor was disabled as of September 24, 2008. (Tr. 97, 104.) The Appeals Council, on July 7, 2009, consolidated Taylor's claims and remanded her case for a new decision. (Tr. 96-100.) The ALJ held a supplemental hearing on July 1, 2010. (Tr. 59-79.) Thereafter, on August 24, 2010, the ALJ issued a decision finding that Taylor was not disabled. (Tr. 101-16.) On February 17, 2012, the Appeals Council denied Taylor's request for review, leaving the ALJ's decision to stand as the final decision of the Commissioner. (Tr. 1-4.)

## II.     STANDARD OF REVIEW

Disability insurance is governed by Title II, 42 U.S.C. § 404 *et seq.*, and SSI benefits are governed by Title XVI, 42 U.S.C. § 1381 *et seq.*, of the SSA. In addition, numerous regulatory provisions govern disability insurance and SSI benefits. *See* 20 C.F.R. Pt. 404 (disability insurance); 20 C.F.R. Pt. 416 (SSI). Although technically governed by different statutes and regulations, "[t]he law and regulations governing the determination of disability are the same for both disability insurance benefits and SSI." *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994).

The SSA defines a disability as a medically determinable physical or mental impairment lasting at least twelve months that prevents the claimant from engaging in substantial gainful activity. 42 U.S.C. §§ 423(d), 1382(a)(3)(A); *McQueen v. Apfel*, 168 F.3d 152, 154 (5th Cir. 1999). To determine whether a claimant is disabled and thus entitled to disability benefits, a five-step analysis is employed. 20 C.F.R. §§ 404.1520, 416.920. First, the claimant must not be presently working at any substantial gainful activity. Substantial gainful activity is defined as

work activity involving the use of significant physical or mental abilities for pay or profit. 20 C.F.R. §§ 404.1527, 416.972. Second, the claimant must have an impairment or combination of impairments that is severe. 20 C.F.R. §§ 404.1520(c), 416.920(c); *Stone v. Heckler*, 752 F.2d 1099, 1101 (5th Cir. 1985). Third, disability will be found if the impairment or combination of impairments meets or equals an impairment listed in the Listing of Impairments ("Listing"), 20 C.F.R. Pt. 404, Subpt. P, App. 1. 20 C.F.R. §§ 404.1520(d), 416.920(d). Fourth, if disability cannot be found on the basis of the claimant's medical status alone, the impairment or impairments must prevent the claimant from returning to her past relevant work. *Id.* §§ 404.1520(e), 416.920(e). Fifth, the impairment must prevent the claimant from doing any work, considering the claimant's residual functional capacity, age, education, and past work experience. *Id.* §§ 404.1520(f), 416.920(f); *Crowley v. Apfel*, 197 F.3d 197, 197–98 (5th Cir. 1999). At steps one through four, the burden of proof is on the claimant to show she is disabled. *Crowley*, 197 F.3d at 198. If the claimant satisfies this responsibility, the burden shifts to the Commissioner to show that there is other gainful employment the claimant is capable of performing in spite of his existing impairment. *Id.*

A denial of disability benefits is reviewed only to determine whether the Commissioner applied the correct legal standards and whether the decision is supported by substantial evidence in the record as a whole. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995); *Hollis v. Bowen*, 837 F.2d 1378, 1382 (5th Cir. 1988). Substantial evidence is such relevant evidence as a responsible mind might accept to support a conclusion. *Boyd v. Apfel*, 239 F.3d 698, 704 (5th Cir. 2001). It is more than a mere scintilla but less than a preponderance. *Id.* A finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings support the decision. *Id.* This Court may neither reweigh the evidence in the record nor

substitute its judgment for the Commissioner's but will carefully scrutinize the record to determine if evidence is present. *Harris v. Apfel*, 209 F.3d 413, 417 (5th Cir. 2000); *Hollis*, 837 F.2d at 1383.

## III.  ISSUES

From a reading of her *pro se* brief, it is difficult to determine exactly what issues Taylor raises on appeal.  It appears that Taylor attempts to raise the following issues:

1.  The ALJ incorrectly dismissed Dr. James Jensen ("Dr. Jensen")'s low GAF[1] rating of 45 and "picked out a few gap [sic] ratings and medical records to his advantage and disregarded the others;"

2.  The characterization of Taylor's volunteer hours and caring for her grandchildren was not accurate; and

3.  Taylor suffers from other severe medical conditions, such as severe manic depression, severe bipolar disorder, chronic hypertension, high cholesterol, and obstetric arthritis disease.

(Plaintiff's Brief ("Pl.'s Br.") at 1-2.)

## IV.  ADMINISTRATIVE RECORD AND ALJ DECISION

The ALJ, in his August 24, 2010 decision found that Taylor last met the disability insured status requirements under Title II of the SSA on March 31, 2009.  (Tr. 106.)  The ALJ stated that Taylor had not engaged in substantial gainful activity after May 16, 2004, her original alleged onset date of disability.  (Tr. 107.)  The ALJ further found that Taylor had the following "severe" impairments: (1) right knee osteoarthritis, (2) cervical degenerative disc disease, (3) hypertension, (4) anemia, (5) obesity, (6) bipolar disorder, (7) post-traumatic stress disorder ("PTSD"), and (8) mood disorder.  (Tr. 107.)  Next, the ALJ held that none of Taylor's

---

[1] In her brief, Taylor refers to various "GAP" ratings. (Pl.'s Br. at 1.) It appears that this is a typographical error and that Taylor is actually referring to various GAF or Global Assessment of Functioning ratings. A GAF score is a standard measurement of an individual's overall functioning level with respect to psychological, social, and occupational functioning. AMERICAN PSYCHIATRIC ASSOCIATION, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 32 (4th ed. 1994) (DSM-IV).

impairments or combination of impairments met or equaled the severity of any impairment in the Listing. (Tr. 107.) As to Taylor's RFC, the ALJ stated:

> Ms. Taylor retains the residual functional capacity, over a sustained period of time, to lift and carry 20 pounds occasionally and 10 pounds frequently; stand and walk (individually or in combination) at least 6 hours in an 8-hour workday; sit at least 6 hours in an 8-hour workday; and otherwise perform the full range of light work, except: she cannot climb ladders, scaffolds, or ropes; she can only occasionally climb ramps or stairs, balance, stoop, kneel, crouch, or crawl; she is limited to jobs with no more than superficial contact with the public; and she is limited to jobs with a reasoning development level of 1 or 2 (as defined in the *Dictionary of Occupational Titles*).

(Tr. 108.)

In support of his physical RFC determination, the ALJ relied, *inter alia*, on the following evidence: (1) the testimony of Dr. Eppstein, the medical expert at the July 1, 2010 hearing before the ALJ, that Taylor was, in essence, capable of performing light work[2] with only occasional climbing of stairs or ropes; no climbing of ropes, ladders, or scaffolds; and only occasional squatting, bending, or crawling (Tr. 108-09; *see* Tr. 75); (2) evidence that in May 2004 Taylor sustained a facial contusion when a co-worker threw a cell phone battery or battery cover at hear, striking her below the right eye (Tr. 109; *see* Tr. 410, 417); (3) a July 2004 examination in which Dr. Ed Cerday, M.D., opined that Taylor's "appearance and affect *did not match her complaint of pain* at a level of 10," that Taylor moved her neck freely, and there was "only some subjective tenderness to palpitation of her right cheek" (Tr. 109; *see* Tr. 407); (4) a July 2006 consultative medical examination in which Dr. Sreekanth Chintamaneni, M.D., noted

---

[2] Pursuant to the regulations, light work is defined as follows:

Light Work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities.

20 C.F.R. § 416.967(b).

that Taylor's physical and neurological examinations were essentially normal (Tr. 109; Tr. 564-66); (5) a January 2009 consultative internal medicine examination in which Dr. Stella Nwankwo, M.D., noted that Taylor: (a) had crepitus in both knees but there was no edema or atrophy, (b) had full range of motion and her gait and station were normal, (c) could heel and toe and tandem walk without difficulties except for pain in her toe, (d) could squat and hop without difficulties, (e) could reach, handle, finger, and feel, and (f) had severe right knee osteoarthritis (Tr. 110; *see* Tr. 897-900); and (6) evidence that Taylor's hypertension was controlled by medication, although there was evidence of noncompliance and that Taylor only took a non-prescription iron supplement for her anemia (Tr. 110).

In support of his mental RFC determination as well as his analysis under the mental impairment "technique,"[3] the ALJ relied, *inter alia*, on the following evidence: (1) a June 2006 Report of Contact in which the Social Security Administration noted that there was no medical

---

[3] Federal regulations require that the ALJ follow mandatory steps when evaluating the severity of mental impairments in claimants, which is known as the "special technique." *See* 20 C.F.R. § 404.1520a. In evaluating mental disorders, the ALJ first considers whether a claimant has a medically determinable mental impairment. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00; 20 C.F.R. § 404.1520a(b)(1). To do so, the ALJ must specify the symptoms, signs, and laboratory findings that substantiate the presence of each impairment. 20 C.F.R. § 404.1520a(b)(1); *Boyd v. Apfel*, 239 F.3d 698, 705 (5th Cir. 2001). For most Listings, the regulations require the ALJ to evaluate the degree of functional limitation resulting from the claimant's mental impairments pursuant to criteria identified in paragraphs A, B, and sometimes C of the adult mental disorders contained in the Listings. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00; 20 C.F.R. § 404.1520a(b)(2) & (c). "Paragraph B" contains four broad functional areas: 1) activities of daily living; 2) social functioning; 3) concentration, persistence, or pace; and 4) episodes of decompensation. 20 C.F.R. § 404.1520a(c)(3); *see* 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00C. The ALJ's written decision must incorporate pertinent findings and conclusions based on the technique and must include a specific finding of the degree of limitation in each of the functional areas described. 20 C.F.R. § 404.1520a(e)(4).

After the ALJ rates the degree of functional limitation resulting from any mental impairment, the ALJ determines the severity of such impairment. 20 C.F.R. § 404.1520a(d). If the degree of functional loss falls below a specified level in each of the four areas, the ALJ must find the impairment is not severe at Step Two of the sequential evaluation process, which generally concludes the analysis and terminates the proceedings. 20 C.F.R. § 404.1520a(d)(1). If the ALJ finds that the mental impairment is severe at Step Two, then the ALJ must determine at Step Three if it meets or equals a listed mental disorder of the Listing. 20 C.F.R. § 404.1520a(d)(2). To determine if it meets or is equivalent in severity to a listed mental disorder, the ALJ must compare the medical findings about the claimant's impairment and the rating of the degree of functional limitation to the criteria of the appropriate listed mental disorder. 20 C.F.R. § 404.1520a(d)(2). If the impairment is severe but does not meet or equal a listed mental impairment, then the ALJ must conduct an RFC assessment. 20 C.F.R. § 404.1520a(d)(3); *see Boyd*, 239 F.3d at 705.

evidence in Taylor's file that shows she had a mental diagnosis or medically determinable mental impairment and that Taylor lived independently in a shelter and took care of herself, her own finances, and used public transportation (Tr. 110; *see* Tr. 327); (2) a letter dated January 2007 examination in which Helene Alphonso, D.O., diagnosed Taylor with a mood disorder and PTSD and gave her a GAF score of 60[4] (Tr. 110; *see* Tr. 589, 632-33); (3) examinations dated May 2007, October 2007, and June 2008 in which doctors reported that Taylor had current GAF scores of 65, 60, and 65, respectively (Tr. 110; *see* Tr. 593, 609, 613); (4) evidence that Taylor could clean, shop, cook, use public transportation, maintain a residence, handle her own finances, and care for her own grooming and hygiene (Tr. 111); (5) evidence that, despite her fear of crowds, Taylor regularly accepted assistance from a family member (Tr. 112); and (6) evidence that Taylor had an intact memory and fair concentration but had marked restrictions in her ability to understand, remember, and carry out detailed instructions (Tr. 112).

The ALJ further opined, based on his RFC assessment, that Taylor was unable to perform any of her past relevant work. (Tr. 114.)   However, because there were jobs that existed in significant numbers in the national economy that Taylor could perform, the ALJ concluded that Taylor was not disabled. (Tr. 115-16.)

## V.   DISCUSSION

### A. <u>Global Assessment of Functioning ("GAF") Scores</u>

Taylor appears to argue that the ALJ erred when he discounted Dr. Jensen's February 12, 2009 GAF rating of 45[5] and subjectively "picked out a few [GAF] ratings and medical records to his advantage and disregarded the others." (Pl.'s Br. at 1; *see, e.g.*, Tr. 902-06.) While Taylor is

---

[4] A GAF score of 51 to 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning.  DSM-IV at 34.

[5] A GAF score of 41 to 50 reflects serious symptoms or any serious impairment in social, occupational, or school functioning.  DSM-IV at 34.

correct that there are a range of GAF scores in her medical records, a GAF score is not determinative of a claimant's ability to work.  See *Fuller v. Astrue*, No. 4:09-CV-197-A, 2010 WL 5566819, at *8 (N.D. Tex. Oct. 13, 2010), *adopted in* 2011 WL 94549 (N.D. Tex. Jan. 11, 2011).  Federal Courts have specifically declined to find a link between a claimant's GAF score and the ability or inability to work.  *See* 65 Fed. Reg. 50,746, 50,764-65 (Aug. 21, 2000) (declining to endorse the GAF scale for use in Social Security and SSI disability programs and stating that the GAF scale "does not have a direct correlation to the severity requirements in our mental disorders listings"); *see also, e.g., Kennedy v. Astrue*, 247 F. App'x 761, 766 (6th Cir. 2007); *Wind v. Barnhart*, 133 F. App'x 684, 692 n. 5 (11th Cir. 2005); *Andrade v. Astrue*, No. 4:11-CV-318-Y, 2012 WL 1106864, at *10 (N.D. Tex. Feb. 13, 2012), *adopted in* 2012 WL 1109476 (N.D. Tex. Apr. 2, 2012).  The ALJ, after reviewing an extensive amount of medical evidence in the record, thoroughly discussed Dr. Jensen's evaluation and opinions and provided explanations for discounting Dr. Jensen's low GAF rating.  (Tr. 108-14.)  Because substantial evidence supports the ALJ's disability determination, there is no evidence that the ALJ erred in such a determination.

Taylor also attached to her brief various medical records, including records dated in August 2009, October 2009, and December 2009 that contained GAF ratings of 55 as well as records dated in July 2007 that contained a GAF rating of 65.[6]  Taylor appears to claim, in essence, that it was error for the ALJ to not consider these records in making his determination. (Pl.'s Br. at 1.)  These records, however, were not provided to the ALJ.

"When new evidence becomes available after the Secretary's decision and there is a reasonable probability that the new evidence would change the outcome of the decision, a

---

[6] A GAF score of 61 to 70 indicates some mild symptoms or some difficulty in social, occupational, or school functioning but generally functioning pretty well with some meaningful interpersonal relationships. DSM–IV at 34.

remand is appropriate so that this new evidence can be considered." *Ripley v. Chater*, 67 F.3d 552, 555 (5th Cir. 1995) (citing 42. U.S.C. § 405(g) and *Latham v. Shalala*, 36 F.3d 482, 483 (5th Cir. 1994)). The Court does not issue factual findings on new medical evidence but is to determine whether to remand for the consideration of the newly presented evidence. *Haywood v. Sullivan*, 888 F.2d 1463, 1471 (5th Cir. 1989). "To justify a remand, 42 U.S.C. § 405(g) requires that the evidence is 'new' and 'material' as well as a showing of 'good cause' for failing to provide this evidence at the original proceedings." *Ripley*, 67 F.3d at 555. To be new, the evidence must not be merely cumulative of the evidence already in the administrative record. *Pierre v. Sullivan*, 884 F.2d 799, 803 (5th Cir. 1989). For evidence to be material, it must relate to the time period for which disability benefits were denied and there must be a reasonable probability that the new evidence would change the outcome of the Commissioner's decision. *Ripley*, 67 F.3d at 555; *see Sullivan*, 884 F.2d at 803.

In this case, Plaintiff, at the very least, has provided no evidence showing good cause for failing to provide these medical records at the proceedings before the ALJ and the Appeals Council. These records, which are dated in 2007 and 2009, were available prior to both the ALJ's August 24, 2010 decision and the Appeals Council's February 17, 2012 decision. Plaintiff has given no reason as to why these medical records were not submitted until after these decisions were issued. Consequently, remand is not required.

## B. <u>Characterization of Taylor's Volunteer Hours and Caregiving</u>

Taylor also complains about that the ALJ's characterization of her volunteer hours and caring for her grandchildren was not accurate. Specifically, Taylor states:

> The statement about me standing 6 hours in the kitchen was not the whole situation. The hours were changed to 3-4 hours. I have a letter from my case manager at the time, stating the actual hours that I volunteered. If I had not volunteered those hours I would have been living on the streets. So I complied

with the shelter and did the best that I could. As far as my grandchildren are concerned; [sic] I do not keep them. Their mother, my daughter Shaquala Taylor[,] is always with them when I have them. My grandchildren have nothing to do with the social security that I paid into for all those years just in case I became disabled. I paid into my social security for 26 years until my disabilities prohibited me from getting and keeping a job.

(Pl.'s Br. at 2.) In support of her claims, Taylor attached to her brief a letter from Tonya M. Mabra, MS ("Mabra"), manager at the Union Gospel Mission of Tarrant County Women's Center. In the letter, Mabra stated that Taylor was a former resident of Union Gospel Mission, was never an employee at Union Gospel Mission, was a participant in Union Gospel Mission's Work Readiness Program, earned approximately $25 per week during parts of 2006 and 2007 as a program stipend, and worked shifts of approximately 3 to 4 hours.

The ALJ discussed the fact that Taylor had stood for six hours as a volunteer several times in his decision, including in his analysis at Step One and in the RFC determination. At Step One, the ALJ found that Taylor did not engage in substantial gainful activity subsequent to May 16, 2004, her alleged onset date of disability. (Tr. 107.) As to this issue, the ALJ further stated:

> At the previous and current hearings, Ms. Taylor testified she last worked in 2004. I note her statement that she stopped working (as a certified nursing assistant) due to reasons other than her impairments; *i.e.*, she was laid off. I also note her testimony that she worked for a year until November 2007 as a kitchen helper, where she stood for six hours at a time performing tasks such as chopping vegetables.

(Tr. 107 (internal citations omitted).)

Further, after reviewing the evidence in the record, the ALJ found that Taylor had the RFC to do the following: (1) lift and carry 20 pounds occasionally and 10 pounds frequently; (2) stand and walk (individually or in combination) at least 6 hours in an 8-hour workday; (3) sit at least 6 hours in an 8-hour workday. (Tr. 108.) The ALJ further found that Taylor could

otherwise perform the full range of light work except that she: (1) could not climb ladders, scaffolds, or ropes; (2) could only occasionally climb ramps or stairs, balance, stoop, kneel, crouch or crawl; (3) could only have superficial contact with the public; and (4) was limited to jobs with a reasoning development level of 1 or 2. *Id.* In his RFC analysis, the ALJ stated:

> In January 2007 Ms. Taylor was diagnosed with mood disorder and PTSD, but she was provided a relatively high Global Assessment of Functioning (GAF) rating of 60. By February 2007 she reported her medications were working. In March 2007 she was also diagnosed with bipolar disorder, but by May 2007 she was provided a relatively high GAF rating of 65, and she was *working in a job requiring her to stand for six hours per day.*

(Tr. 110 (internal citations omitted) (emphasis in original).)

As to Taylor caring for her grandchildren, the ALJ mentioned this fact several times in his decision, including the following statements:

> The second area of the "B" criteria, "Social Functioning," refers to an individual's capacity to interact independently, appropriately, effectively, and on a sustained basis with others, including family members and friends. Given her testimony regarding fear of crowds, I determined that Ms. Taylor has moderate limitations in her social functioning due to her mental impairments, but I also considered her testimony that she regularly accepts assistance from a family member and the evidence that she readily accepts input from others regarding her behavior. At the current hearing, she testified that she cares for her five grandchildren at times. I found no evidence of "marked limitations in this area; *e.g.,* she does not exhibit highly antagonistic, uncooperative, or hostile behavior.

> . . . .

> At the current hearing, Ms. Taylor testified as follows:

> She lives alone in a second floor apartment and has difficulty with the stairs. She performs household chores (*e.g.,* washing dishes, sweeping, and mopping) and prepares meals. She has a driver's license but does not drive, and she goes grocery shopping with her daughter. She has five grandchildren and cares for them at times.

> . . . .

> Ms. Taylor's statements and testimony suggest her symptoms affect her functional limitations more than would be indicated by the

11

objective evidence alone. In this regard, however, her credibility is called into question by the evidence of symptom magnification and noncompliance with her medical treatment plan, as noted above. In addition, I considered that she may be motivated by secondary gain to obtain Federal disability benefits. In this case, she would gain by avoiding competitive work to attend to personal interests and responsibilities such as caring for her grandchildren in the home.

(Tr. 112-14 (internal citations omitted).)

Even assuming the ALJ erred in stating that Taylor had stood for 6 hours instead of 3-4 hours in her work/volunteer history, Taylor has pointed to no error that resulted from such a conclusion. As to the ALJ's determination at Step One, the ALJ, notwithstanding how long Taylor had performed volunteer work at the shelter, found that Taylor had not engaged in substantial gainful activity after May 16, 2004. (Tr. 107.) The ALJ did not find that Taylor's subsequent volunteer hours at the shelter in 2006 or 2007 constituted substantial gainful activity. As to the RFC determination, there was substantial evidence[7] supporting the ALJ's determination even without considering the number of hours Taylor volunteered at the homeless shelter and how long she stood as part of these activities.

As to the ALJ's findings that Taylor cared for her grandchildren, Taylor at the July 1, 2010 hearing before the ALJ specifically stated that she had five grandchildren and she took "care of them when their mothers bring them over." (Tr. 72.) Thus, it does not appear that the ALJ erred in stating several times in his decision that Taylor had five grandchildren and cared for them at times as this is specifically what Taylor testified to at the hearing. The ALJ never stated in his decision that Taylor cared for the children by herself. Furthermore, even assuming that the ALJ erred in stating that Taylor cared for her grandchildren, Taylor again has pointed to no error that resulted from such a conclusion.

---

[7] Such evidence includes examination records dated May 8, 2007 in which Taylor reported that she had been suffering from leg spasms for 2 ½ years and that she stood six hours daily at her job. (Tr. 110, 651.)

As to his analysis of the "B" criteria as required in the "special technique" in which the ALJ found that Taylor was moderately limited in her social functioning, there is other evidence in the record that supports such a determination without considering how Taylor cared for her grandchildren.    Specifically, the ALJ noted that there was evidence that Taylor regularly accepted assistance from a family member and readily accepted input from others regarding her behavior. (Tr. 112.) In addition, as to his analysis of Taylor's credibility, there is also other evidence, as pointed out by the ALJ, that supports the ALJ's credibility determination without considering how Taylor cared for her grandchildren.

To be entitled to relief, the claimant must establish that the ALJ erred and that the ALJ's error casts into doubt the existence of substantial evidence to support the ALJ's decision. *Morris v. Bowen*, 864 F.2d 333, 335 (5th Cir. 1988); *see also Falco v. Shalala*, 27 F.3d 160, 163–64 (5th Cir.1994) ("That [the ALJ] did not follow formalistic rules in his articulation compromises no aspect of fairness or accuracy that this process is designed to ensure."). Taylor has not made such a showing. Any errors in the ALJ's statements concerning the number of hours Taylor volunteered at the shelter or how she cared for her grandchildren were harmless. "Procedural perfection in administrative proceedings is not required" as long as "the substantial rights of a party have [not] been affected." *Mays v. Bowen*, 837 F.2d 1362, 1364 (5th Cir. 1988). The ALJ's decision is not subject to reversal, even though there may be substantial evidence in the record that would have supported the opposite conclusion, because substantial evidence also supports the conclusion that was reached by the ALJ. *See Dollins v. Astrue*, 2009 WL 1542466, at *5 (N.D. Tex. June 2, 2009) (citing *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997) and *Steed v. Astrue*, 524 F.3d 872, 874 (8th Cir. 2008)). Consequently, remand is not required.

## C. **Other Severe Medical Conditions**

Taylor also appears to argue that the ALJ erred in not finding that her conditions of manic depression, bipolar disorder, chronic hypertension, high cholesterol, and obstetric arthritis disease were severe at Step Two. (Pl.'s Br. at 2.) In this case, contrary to Taylor's claims, the ALJ specifically found at Step Two that Taylor suffered from several severe impairments including hypertension, bipolar disorder, PTSD, and mood disorder. (Tr. 107). As to her claim that she suffers from the severe conditions of manic depression (as separate from her bipolar disorder, mood disorder, and PTSD), high cholesterol, and obstetric arthritis, Taylor has pointed to no evidence in the record that supports such claims. Even assuming Taylor has been diagnosed with these impairments, the mere diagnosis or treatment of an impairment does not make it "severe." *See, e.g., Martinez v. Astrue*, No. 4:10-CV-883-Y, 2011 WL 3930219, at *8 (N.D. Tex. Aug. 18, 2011) ("[T]he mere diagnosis of a mental impairment such as depression 'says nothing about the severity of the condition.'") (quoting *Parra v. Astrue*, No. 4:07-CV-443-Y, 2009 WL 49999, at *5 (N.D. Tex. Dec. 3, 2008)). Contrary to Taylor's claims, there is nothing in these records that indicates Taylor's alleged impairments of manic depression, high cholesterol, or obstetric arthritis disease were in any way interfering with Taylor's ability to work. Consequently, there is no evidence that the ALJ erred at Step Two, and remand is not required.

## RECOMMENDATION

It is recommended that the Commissioner's decision be affirmed.

## <u>NOTICE OF RIGHT TO OBJECT TO PROPOSED</u><br><u>FINDINGS, CONCLUSIONS AND RECOMMENDATION</u><br><u>AND CONSEQUENCES OF FAILURE TO OBJECT</u>

Under 28 U.S.C. § 636(b)(1), each party to this action has the right to serve and file specific written objections in the United States District Court to the United States Magistrate Judge's proposed findings, conclusions and recommendation within fourteen (14) days after the party has been served with a copy of this document. The United States District Judge need only make a *de novo* determination of those portions of the United States Magistrate Judge's proposed findings, conclusions and recommendation to which specific objection is timely made. *See* 28 U.S.C. § 636(b)(1). Failure to file, by the date stated above, a specific written objection to a proposed factual finding or legal conclusion will bar a party, except upon grounds of plain error or manifest injustice, from attacking on appeal any such proposed factual findings and legal conclusions accepted by the United States District Judge. *See Douglass v. United Servs. Auto Ass'n*, 79 F.3d 1415, 1428–29 (5th Cir. 1996) (en banc).

## <u>ORDER</u>

Under 28 U.S.C. § 636, it is hereby **ORDERED** that each party is granted until July 1, 2013, to serve and file written objections to the United States Magistrate Judge's proposed findings, conclusions and recommendation. It is further **ORDERED** that if objections are filed and the opposing party chooses to file a response, the response shall be filed within seven (7) days of the filing date of the objections.

It is further **ORDERED** that the above-styled and numbered action, previously referred to the United States Magistrate Judge for findings, conclusions and recommendation, be and hereby is returned to the docket of the United States District Judge.

SIGNED June 17, 2013.

JEFFREY L. CURETON
UNITED STATES MAGISTRATE JUDGE